**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| **v.** | : | **VIOLATIONS:** |
| | : | **21 U.S.C. §§ 843(a)(3) and 846** |
| **VENKATA SRINIVAS MANNAVA,** | : | **(Conspiracy to Obtain Controlled** |
| | : | **Substances, to wit, Oxycodone, by** |
| **Defendant.** | : | **Prescription Fraud)** |
| | : | **18 U.S.C. §§ 1347, 1349** |
| | : | **(Conspiracy to Commit  Health Care** |
| | : | **Fraud)** |
| | : | |
| | : | **FORFEITURE:** |
| | : | **21 U.S.C. § 853, 18 U.S.C. § 982(a)(7)** |

**CRIMINAL INFORMATION**

The United States Attorney charges that:

Count One

**Conspiracy to Obtain Controlled Substances by Prescription Fraud**

Beginning on or about December, 2010, the exact date being unknown to the Grand Jury, and continuing through October 31, 2011, within the District of Columbia and elsewhere, **Venkata Srinivas Mannava,**  did knowingly and intentionally combine, conspire, confederate and agree with others both known and unknown, to obtain the following Schedule II controlled substances: oxycodone (also marketed as oxycontin), by prescription fraud contrary to the provisions of Title 21, United States Code, Sections 843(a)(3) and 846.

**Goal of the Conspiracy**

It was a goal of the conspiracy to obtain money and other things of value by distributing and causing pharmacists to dispense controlled substances by forged prescription.

1

**Manner and Means**

It was part of the conspiracy that the conspirators attained the goals and purposes of the conspiracy through the following manner and means:

A.   During the period of the conspiracy, the defendant, Venkata Srinivas Mannava was a pharmacist duly licensed by the District of Columbia and by the Drug Enforcement Administration and as such was authorized to dispense controlled substances and other prescription required pharmaceuticals.  He was so employed at Pharmacare Discount Pharmacy, 651 Florida Ave., N.W., Washington, D.C. which operated as a pharmacy.  While there, during the period of the conspiracy, he accepted prescriptions for oxycontin presented to him by a person whom he knew as Dave, who was later determined to be Ewuanet Dagnachew Asfaw.

B.   During the course of the conspiracy, Ewuanet Dagnachew Asfaw presented 631 prescriptions, all for oxycontin, (active ingredient is oxycodone, a schedule II controlled substance) all on prescriptions with the forged name of Dr. Jacobson,  all on prescriptions that had been discontinued by the Washington Brain and Spine Institute over six years previously, all in the names of real and sometimes fictitious people, and all filled by the defendant Venkata Srinivas Mannava,  acting as a pharmacist, .   It was also part of conspiracy that Ewuanet Dangachew Asfaw paid cash of these prescriptions and often brought in several thousands of dollars at a time to pay for these prescriptions.

C.   During the conspiracy, Venkata Srinivas Mannava failed to verify any of these suspicious prescriptions, failed to confirm from the Washington Brain and Spine Institute whether or not Dr. Jacobson had written any of these  prescriptions for any of the 100 or so names that they were written for, and failed to determine whether Dr. Jacobson was actually a physician working at the Institute.   Venkata Srinivas Mannava, in filling these prescriptions

under these circumstances, dispensed controlled substances which conduct was contrary to the legal standards imposed applicable to pharmacists in filling prescriptions for controlled substances under 21 C.F.R. 1306.04(a).

**Overt Acts Summarized**

The conspirators committed the following overt acts in furtherance of goals and objectives of the conspiracy summarized below:

1. Between December 2010 and October 31, 2011, at the Pharmacare Discount Pharmacy in Washington, D.C., in a succession of weekly intervals, Venkata Srinivas Mannava, filled and dispensed 631 prescriptions which totaled over 145,440 oxycodone pills, which were calculated to be 142,320 pills containing 30 mg of oxycodone (the active ingredient in OxyContin) each, and 9,120 pills containing 20 mg of oxycodone each.

2. Further Pharmacare Discount Pharmacy received cash totaling $211,829.74 for these prescriptions.

(**Conspiracy to Obtain Controlled Substances, to wit, Oxycodone, by Prescription Fraud,** in violation of 21 U.S.C. §§ 843(a)(3) and 846)

**COUNT TWO**

**Conspiracy to Commit Health Care Fraud**

At all times relevant:

1. Defendant **VENNATA SRINIVAS MANNAVA (hereinafter, MANNAVA)** was employed by Pharmacare LLC, a privately owned pharmacy store chain. Pharmacare did business in the District of Columbia, Maryland and elsewhere. Beginning in or about October 2011, **MANNAVA** worked at Pharmacare at DC, 651 Florida NW Ave, Washington, DC 20001.

2.      Medicare and Medicaid are health care benefit programs as defined under 18 U.S.C. § 24(b).   Medicaid is a joint federal and state program.   Both Medicare and Medicaid offer prescription drug benefits to certain covered individuals.    Many private insurance companies are also health care benefit programs and provide similar prescription drug benefits. Collectively, these entities covering prescription drug benefits will be referred to as "health care benefit programs."   Typically, the health care benefit programs reimburse pharmacies for a substantial portion of the cost of prescription drugs dispensed to a beneficiary.   The individual patient pays only a small deductible for the prescription drugs to the pharmacy.   The health care benefit programs require that, in order for a pharmacy to receive reimbursement, the prescription drugs must actually be dispensed to the patient.

## THE CONSPIRACY

3.      Beginning in or about October 2011, and continuing through December 2012, the exact dates being unknown, in the District of Columbia, the District of Maryland and elsewhere, the defendant, **VENNATA SRINIVAS MANNAVA,** together with others known and unknown, did willfully execute and attempt to execute a scheme and artifice to defraud any health care benefit program, and to obtain, by means of false and fraudulent pretenses, representations and promises, money and property owned by and under the custody and control of any health care benefit program, in connection with the delivery and payment for health care benefits, items and services, as set forth more fully below.

## THE SCHEME AND ARTIFICE TO DEFRAUD
## HEALTH CARE BENEFIT PROGRAMS

4.      It was part of the scheme to defraud that employees of Pharmacare, known and unknown, would, at the direction of Pharmacare's owner, identify customers of Pharmacare who

had filled prescriptions at the pharmacy and for which there were "available" prescription refills remaining.

5.      It was further part of the scheme to defraud that **MANNAVA**, and other employees of Pharmacare, known and unknown, would, at the direction of Pharmacare's owner, cause a false and fraudulent claim to be electronically submitted to a health care benefit program for a prescription refill that had not been requested and/or dispensed.

6.      It was further part of the scheme to defraud that **MANNAVA**, and other employees of Pharmacare, known and unknown, would, at the direction of Pharmacare's owner, participate in after-hour automatic refill billings in order to ensure certain revenue for Pharmacare at a particular time.

7.       It was further part of the scheme to defraud that employees of Pharmacare, known and unknown, and with the knowledge of Pharmacare's owner, would not reverse, or back out, insurance claims submitted for refills when the prescription drugs were not actually dispensed to, or received by, a customer.

8.      It was further part of the scheme to defraud that employees of Pharmacare, known and unknown, at the direction of Pharmacare's owner, would re-use the prescription drug refills that were not delivered or picked up by a customer by, among other things, re-stocking the inventory in the pharmacy.

9.      It was further part of the scheme to defraud that the owner of Pharmacare personally profited from the scheme to defraud through his ownership of Pharmacare, and that **MANNAVA** and other employees who participated in the scheme to defraud personally profited through their employment at Pharmacare.

## EXECUTION OF THE SCHEME TO DEFRAUD

10.     Beginning in or about October 2011, and continuing through December 2012,  in the District of Columbia, the District of Maryland and elsewhere, the defendant, **VENNATA SRINAVAS MANNAVA,** did knowingly and willfully execute and attempt to execute the scheme and artifice to defraud health care benefit programs and to obtain by means of false or fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, the named health care benefit program, in connection with the delivery of and payment for health care benefits, items and services; to wit, by submitting claims for reimbursement to health care benefit programs for Pharmacare for prescription refills when the prescription refills were neither requested by the customers nor dispensed to or received by the customers and by failing to reverse the claims to the health care benefit programs and re-stocking the medications which had been billed to various health insurance programs.

**(Conspiracy to Commit Health Care Fraud,** in violation of Title 18 United States Code, Sections 1347, 1349 and 2)

## <u>FORFEITURE ALLEGATION</u>

1.     Upon conviction of the offense alleged in Count One, the defendant shall forfeit to the United States, pursuant to 21 U.S.C. § 853(a), any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of this offense; and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of this offense.  The United States will seek a forfeiture money judgment against the defendant of at least $2,500,000, but not greater than $7,000,000.

2.     Upon conviction of the offense alleged in Count Two, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or

indirectly, from gross proceeds traceable to the commission of this offense, pursuant to 18 U.S.C. § 982(a)(7).  The United States will seek a forfeiture money judgment against the defendant of at least $2,500,000, but not greater than $7,000,000.

3.      If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

        (a)      cannot be located upon the exercise of due diligence;

        (b)      has been transferred or sold to, or deposited with, a third party;

        (c)      has been placed beyond the jurisdiction of the Court;

        (d)      has been substantially diminished in value; or

        (e)      has been commingled with other property that cannot be subdivided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

       **(Criminal Forfeiture,** pursuant to 21 United States Code, Section 853; Title 18 United States Code, Section 982(a)(7))

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney
D.C. Bar No.  447889


By:     _____
JOHN P. DOMINGUEZ
Assistant United States Attorney
D.C. Bar No. 959809
Violent Crimes and Narcotics Section
555 4th Street, NW, Suite 4205
Washington, DC 20530
(202) 252-7684
E-mail: John.Dominguez@usdoj.gov

7