## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** 14-39 (TFH) |
| | : | |
| **v.** | : | |
| | : | |
| **VENKATA SRINIVAS MANNAVA,** | : | |
| **Defendant** | : | |

### AGREED STATEMENT OF FACTS
### IN SUPPORT OF GUILTY PLEA

The United States of America, through its attorney, the United States Attorney for the

District of Columbia, submits the following statement of facts in support of the defendant's

guilty plea to a criminal information filed in the above case.   The defendant, with the

assistance of counsel, has reviewed the below statement of facts, which the Government

would prove if the case were to proceed to trial, and agrees to the following facts in support

of the guilty plea:

1.  The defendant is named Venkata Srinivas Mannava, and is a citizen of India who is in

the United States lawfully pursuant to a visa. Venkata Srinivas Mannava is now and was

between December 2010 and continuing to the present, a pharmacist licensed by the District of

Columbia and Maryland, and authorized to dispense controlled substances and other

pharmaceuticals. Mannava was employed at Pharmacare At DC LLC, D/B/A Pharmacare

Discount Pharmacy 651 Florida Ave., N.W., Washington, D.C. but is no longer employed

there.   In fact, Mannava was promised up to a 3% interest in the Pharmacare Discount

Pharmacy.  Pharmacare at DC is part of a chain of pharmacies primarily owned and operated

by Reddy Vijay Annappareddy (hereafter referred to as Annappareddy).

1

Facts related to Count One, dispensing oxycodone through fraudulent prescriptions:

    2.  On October 31, 2011, Metropolitan Police Department officials arrested Ewanet

Dagnachew Asfaw at Pharmacare Discount Pharmacy, at 651 Florida Ave. N.W., Washington,

D.C. while he was waiting to pick up prescriptions for oxycodone (trade name oxycontin), a

Schedule II Controlled Substance, which he had presented in the names of five different

people.  All the prescriptions had been forged in the name of Dr. Jeff Jacobson, and were

written on a prescription form that had been discontinued by Dr. Jacobson's office, the

Washington, Brain and Spine Clinic, six years previously.  Following the arrest of Mr. Asfaw,

the Drug Enforcement Administration's Tactical Drug Diversion Task Force began an

investigation that revealed that Asfaw  had passed similar forged prescriptions in Dr. Jeff

Jacobson's name in other pharmacies in Virginia and Maryland, all for oxycontin.  Eventually,

DEA investigators discovered that Asfaw had presented a total of 631 prescriptions between

December, 2010 and October 31, 2011, all for oxycontin (oxycodone is the active ingredient in

oxycontin), all with the forged name of Dr. Jacobson, all in the names of real and sometimes

fictitious people none of whom were patients of Dr. Jacobson, and all on prescriptions that had

been discontinued by the Washington Brain and Spine Clinic six years before October, 2011

(when Asfaw was arrested), but all of which had been filled by Venkata Mannava at

Pharmacare Discount Pharmacy in D.C.  The prescriptions at Pharmacare Discount Pharmacy

directed the dispensing of over 145,440 oxycodone pills, which were calculated to be 142,320

pills containing 30 mg of oxycodone (the active ingredient in Oxycontin) each, and 9,120  pills

containing 20 mg of oxycodone each.  Further investigation revealed that each prescription

had been paid for in cash, in amounts totaling $211,829.74.

3.   On December 8, 2011, law enforcement officials interviewed Venkata Mannava after learning that he had filled all the prescriptions presented by Asfaw.  Mannava agreed to the interview as he was not under arrest, nor compelled to answer questions.  During the interview, Venkata Mannava admitted to filling all the prescriptions presented by Asfaw (whom he identified as a man known to him as "Dave").  At this interview, Mannava claimed that he thought that the prescriptions presented by Asfaw, aka "Dave," were all legitimate, so he never called Dr. Jacobson to confirm.  However, he claimed that he did call the office phone number listed on the prescriptions, spoke to an employee there, but only asked what their prescriptions looked like. This was untrue.  Mannava also admitted to the investigator that he did not ask if any of the names on the prescriptions presented to him were patients of Dr. Jacobson, nor did he ask if Dr. Jacobson had signed and issued any of the prescriptions presented to him.  Mannava explained initially that he sought only a description of the prescriptions used, then claimed that the description told to him over the phone matched those prescriptions presented to him, so he filled those prescriptions and every prescription presented by Asfaw, aka "Dave,"  thereafter until the fraud was revealed on October 26, 2011.

4.   The office manager of the Washington Brain and Spine Institute was interviewed and asserted that no such verification call was ever received for any of the Dr. Jacobson prescriptions recovered at Pharmacare Discount Pharmacy.  She explained that Dr. Jacobson had retired from practice six years before issuance of the first prescription presented, and that the Washington Brain and Spine Institute ceased using the prescriptions which listed Dr. Jacobson's name on the forms immediately thereafter.  She further explained that none of the prescriptions

3

presented by Asfaw were issued in the names of patients from the clinic, and all of the prescriptions contained Dr. Jacobson's forged signature. Dr. Jacobson, although retired, was also interviewed and he too explained that he retired six years before the prescriptions were presented by Asfaw and filled by the pharmacy, and that all these 631 prescriptions were forged and never written by him or under his direction. All were invalid.

5. Further investigation revealed that Asfaw paid cash to Mannava for all 631 prescriptions and none were paid or reimbursed by health care insurance. Asfaw presented the prescriptions, usually 7 to 10 or more than a dozen at a time, each week, between December 2010 and continuing until October 31, 2011, and Asfaw would bring several thousands of dollars in cash to pay for each batch of prescriptions. An inventory of oxycodone/oxycontin at Pharmacare revealed no shortages of the controlled substances, and further, the pharmacy receipts reflect that cash payments were received for each of the 631 prescriptions. The inventory of oxycontin corresponded to the sales records and business receipts indicate that Pharmacare received payment, albeit in cash, for all the pills dispensed. Mannava stated in an interview with law enforcement in 2014, that the first time Dave came into the pharmacy, Mannava called Annappareddy and advised him there was a customer there who wanted to  pay cash for oxycontin and inquired how much he could charge for the prescription. Annappareddy first asked about the DC pharmacy's actual cost for the medication and what a chain pharmacy store (business competitor) was charging and then advised Mannava to charge $350 to fill for the prescription. From that point on, each time that Dave came to the pharmacy and paid cash, Mannava would put the cash with the other pharmacy cash receipts to be delivered to Annappareddy at a later time in the ordinary course of business.

4

6.   On October 26, 2011, ~~Caitlin Beamer~~ (a PharmaCare employee) went to the
Washington Brain and Spine Institute  (clinic) and inquired whether or not their prescriptions r
for oxycodone could be switched to an alternative pain killer because there was  a shortage of
oxycodone in the industry that had been brought to her attention by Mannava and Mannava had
been filling a large number of oxycodone prescriptions for Dave on behalf of the Washington
Brain and Spine Institute.  At the clinic, Beamer learned that the handful of patients who were
being prescribed the oxycodone were not in fact patients of the clinic.  Beamer told
Annappareddy  who informed Mannava what they had learned.  Mannava immediately called
the police who responded and discussed the situation with Mannava on October 26, 2011.
Mannava told the police that the contact for the prescriptions was a man named "Dave" who
held himself out to be a clinic driver for the Washington Brain and Spine Institute.

7. On October 31, 2011, Dave again came to the pharmacy as expected in hopes of
getting Mannava to fill oxycontin  prescriptions.   With Pharmacare's knowledge, the police
were present in the pharmacy in anticipation of Dave's arrival and Dave was arrested after
presenting additional fraudulent prescriptions purporting to bear Dr. Jacobson's signature.
Dave was identified as Euwanet Asfaw.  Asfaw subsequently pled guilty to conspiracy to
distribute and cause the dispensing of controlled substances involving the 631 forged
prescriptions at Pharmacare Discount Pharmacy.  He agreed to cooperate against others
involved in the conspiracy including Venkata Mannava whom he knew as "Sri."  Asfaw  stated
under oath, among other things, that when he first presented the first Dr. Jacobson forged
prescriptions to Pharmacare, he found that the pharmacist, later learned to be Venkata "Sri"
Mannava, filled them without verifying the validity of the prescriptions.  He presented fake

5

driver's licenses in the names of the persons listed on the various prescriptions, and he paid

cash.  The relationship continued from December, 2010 until his arrest on October 31, 2011.

By prior arrangement, he would call the pharmacist (Venkata Mannava) to make sure the

medication would be in stock when Asfaw presented the prescriptions, and he would tell how

many prescriptions and how much oxycontin was involved, and  Mannava would tell him how

much cash to bring.  According to Asfaw, Mannava would take the cash from Asfaw along

with the prescriptions, and begin filling the prescriptions.  Asfaw assumed that Mannava kept

some of the cash for his role in the conspiracy, but never wanted receipts, never knew how

much he was paying for each filled prescription, and never kept track of how much money he

was paying for the pills and how much cash was going to Mannava.  Asfaw explained that did

not care about the retail costs involved, as he only wanted the prescriptions filled because he

and others would sell the pills thereafter, (at a significant profit)  as there was a strong demand

for these oxycontin pills (containing oxycodone) on the illegal market.  During interviews,

Asfaw identified a Maryland Department of Motor Vehicle license picture as the pharmacist,

Mannava, whom he knew as Sri and as the pharmacist who filled all of the prescriptions he

had presented.

       8.      On December 8, 2011,  five weeks following the arrest of Asfaw, law

enforcement agents interviewed Mannava.  Mannavasaid that he filled the prescriptions

brought in by Asfaw (whom he knew as "Dave") in the names of about 100 different people

because Asfaw had brought the drivers licenses of the patients to match the prescriptions.

Mannava admitted that all the prescriptions were paid by cash.  These medications are very

expensive and depending on the strength of the oxycontin pills, a month long supply costs

about $750 to $3000.  (About 95% of such prescriptions are covered by insurance normally, so

the volume of cash transactions for this medication was cause alone for suspicion).

     9.    As a licensed pharmacist and health care professional Venkata Mannava was

aware of the following legal standard applicable to him as a pharmacist:

> Title 21, Code of Federal Regulations, Section 1306.04(a) provides:
> A prescription for a controlled substance to be effective must be
> Issued for a legitimate medical purpose by an individual
> practitioner acting in the usual course of his professional practice.
> The responsibility for the proper prescribing and dispensing of
> controlled substances is upon the prescribing practitioner, but **a**
> **corresponding responsibility rests with the pharmacist who fills the**
> **prescription**. (emphasis supplied).
> An order purporting to be a prescription issued not in
> the usual course of professional treatment or in legitimate and
> authorized research is not a prescription within the meaning and
> intent of section 309 of the Act (21 U.S.C. § 829) and the person
> knowingly filling such a purported prescription, as well as the
> person issuing it, shall be subject to the penalties provided for
> violations of the provisions of law relating to controlled substances.

     10.  If the case were to proceed to trial, the Government would present expert

testimony of a pharmacist and pharmacy administrator, through Dr. Donald Sullivan, Ph.D.,

Pharmacy Administration and professor at Ohio Northern University that Venkata Mannava

acted in violation of the above legal standard in failing to verify suspicious prescriptions

presented to him by Asfaw.  He would testify that calling an employee of the doctor's office

and asking for a description of the prescriptions on the clinic's prescription pad, or for a color

of the prescription, is not verification of the prescription and is conduct below the legal

standard applicable to pharmacists in filling prescriptions for controlled substances.  At best

the December 2011 statement of Venkata Mannava to law enforcement investigators

constitutes evidence of deliberate ignorance and is no verification at all.

11.     On May 31, 2013, Mannava received a target letter from the U.S. Attorney's Office in D.C. which advised him to get an attorney and discuss the case with the prosecutor as an indictment was imminent. Mannava reported to law enforcement investigators in an interview in 2014 that after receiving the target letter, Mannava went to Annappareddy's house with family members in order to discuss the situation and the fact that Mannava did not profit or keep the money from the drug transactions. Rather, Mannava stated that the money had been handled in the ordinary course of business of the D.C. Pharmacy with other cash received (e.g. other customers, lottery sales receipts, etc.) by being delivered or provided to Annappareddy. Annappareddy admitted to those present that Mannava had remitted all cash from the D.C. pharmacy in the ordinary course but that he did not have a cash surplus to return because the money had already been spent. Annappareddy's suggestion was for Mannava to leave the country and that he would help him to do so.

12.     Instead, Mannava advised Annappareddy that he was going to retain an attorney and talk to the Government prosecutor and agents. Thereafter and with the assistance of counsel, Mannava sought to resolve the investigation before indictment. Mannava stated to investigators that he did not have actual knowledge that the prescriptions Asfaw was presenting to him to fill were invalid and forged. He stated that he lacked that knowledge because he did not verify the authenticity of the prescriptions. He admitted that under these circumstances, as a licensed pharmacist and health care professional, he had reason to question the validity of such prescriptions and that he should have known the prescriptions were invalid and/or forged. Moreover, he admitted that was initially untruthful with investigators about the verification of the prescriptions because he was scared. He also admits that he did not exercise

due diligence when presented with the forged prescriptions and had he acted in accordance with his professional responsibility as a pharmacist he would have known or should have known that all the prescriptions from "Dave" that he filled were invalid.

13.  The defendant Venkata Mannava agrees that $211,829.74 represents the amount of money used to pay for the prescription drugs illegally acquired, and constitutes property derived from and proceeds obtained as the result of the offense of conspiracy to fraudulently dispense and distribute controlled substances in violation of 21 U.S.C. §§ 843(a)(3), 841(a)(1), and 846. Under U.S. forfeiture law, 21 U.S.C. § 853, Venkata Mannava is jointly and severally liable for forfeiture in the amount of $211,829.74.

Facts Related to Health Care Fraud

14.  The defendant Mannava also engaged in a scheme to defraud Medicaid and other insurers with his employer and partner, Annappareddy, together with other employees of the Pharmacare chain.  Specifically, Mannava and others at Pharmacare billed prescription insurance programs for prescriptions refills when its customers did not request the prescription refill.  The scheme worked as follows.  Pharmacare billed prescription insurance programs for refills on the first available date that a program authorized payment. These refills were oftentimes filled and billed without the customer's knowledge.  Pharmacare did not reverse the claims for payment for some of the high dollar medication submitted to prescription insurance programs when its customers did not receive the refills which the customer never requested in the first place.  The scheme generated a significant amount of revenue for Annappareddy and Pharmacare.   The prescription insurance programs were wrongfully charged for many of these monthly "automatic refills" that beneficiaries never received.  In other words, Pharmacare did

9

not "reverse" the claims and return the money to the prescription insurance programs (s).

15.     Mannava began working for the Pharmacare Discount Pharmacy in Washington, D.C. in 2010.  He was hired by Annappareddy, the owner of Pharmacare locations in DC and in Maryland.  Mannava, a citizen of India, entered the U.S.A. with permission to work under an H-1B visa.  This visa authorizes employment if he has a sponsor for employment.  Annappareddy offered such employment and was Mannava's sponsor under the H-1B visa.  At some point later, Mannava's visa changed to that of a permanent resident alien.

16.     Beginning in November 2011, at times Mannava would report at the direction of or with the knowledge of Annappareddy to Pharmacare at Plumtree, LLC, 208 Plumtree Road, Suite A, Bel Air, Maryland  21015   and other Pharmacare locations (sometimes traveling from the pharmacy where he worked in D.C,) at the end of each month, in the evenings after the pharmacy is closed, and on weekends.   The purpose of Mannava's visits to these other locations was to review the store's prescription software system to see if any current customers had prescription refills immediately available for billing regardless of customer request.  With Mannava present as the pharmacist on site, pharmacy technicians to include Jigar Patel, Vipin Patel, Sindhura Motaparthi and others, would bill prescription insurance programs.  The billing would be done for all of that store's customers who had an immediately available refill in their electronic file but without actually filling all the prescriptions.  The purpose of these acts were to generate prescription refill revenues at the end of each month.  Although the pharmacy technicians processed the actual billing, Mannava was listed as the filling pharmacist for such refills, and he was aware that his name and title was being so used in this billing scheme.  According to Mannava who made a series of statements to law enforcement about the health

10

care fraud investigation, as of November 1, 2012, he no longer logged into the system and no longer did claims for refills. However, Mannava was present on New Year's Eve December 2012 when automatic refills were conducted after hours. Mannava had been to Annappareddy's home earlier that evening as he and his wife had been invited to a party to celebrate the New Year. Upon arriving at the house, Annappareddy instructed Mannava to go to the pharmacy because there was no pharmacist to oversee the others "doing the numbers" – that is, doing the end of the month refills. Annappareddy wanted to make sure that the numbers were more than the November billings. For example, Mannava, and others including Vipin Patel were at Pharmacare Plumtree until 11:40 p.m. on New Year's Eve 2012, having arrived after the pharmacy had closed for the holiday. At the direction of and with the knowledge of Annappareddy, the employees billed prescription insurance programs for all prescription refills that the pharmacy technicians deemed eligible for refill. On New Year's Eve, numerous claims were made without packaging or filing the prescriptions. To the extent Mannava's pharmacist computer log identification was on the system after November 1, 2012, it is because Vipin Patel had access to his log in password-- having created in the first place. Mannava has seen Vipin Patel and others on line using his pharmacy ID and knows that Vipin Patel can bypass the system calling for his passcode. In this manner, the pharmacy technicians, using and listing Mannava (or sometimes using the owner, Reddy) as the presiding "filling pharmacist" would generate prescription refill billing.

17.     Mannava was in the inner circle at Pharmacare and particularly with Annappareddy. In this regard, he knew about what was referred to by Annappareddy's inner circle as the "L" list, a source of illegal revenue for Annappareddy. In an email from Mannava

11

to Annappareddy dated January 23, 2011, Mannava summarized a private discussion that he had

with Annappareddy the previous day concerning Mannava's income as it related to his 5% [sic

3%] ownership interest in Pharmacare DC.  In that email, Mannava  identified "25% of Ls at

D.C." as a source of income, all the time  knowing that the billings from the "L" list were based

on fraud; that is, prescriptions billed to insurance companies but medication not always provided

or delivered to customers, medication not requested by customers, and claims for prescription

refill charges never reversed to the insurance companies.

      18.    At this time, the Government estimates the fraud loss to the health care insurance

programs for which Mannava may be held accountable for all of the Pharmacare locations at an

amount greater than $2 million but less than $7 million.  The precise amount will be disclosed

before sentencing but is currently still being calculated.  A Medicare Drug Integrity Contractor

(MEDIC) conducted an invoice review for all Pharmacare locations except for those in

Michigan, and New Jersey.   The review compared the paid claims data from Medicare, the

Maryland Aids Drug Assistance Program, the Maryland, D.C. and North Carolina Medicaid

Programs (fee for service only), TriCare, and FEHBP with the numbers of drugs purchased from

the wholesalers for the time period January 1, 2007 through October 31, 2012. The purpose of

the review was to determine if Pharmacare locations billed Prescription Insurance Programs for

more prescription drugs than they purchased from suppliers.  Each of the nine Pharmacare

locations examined reflected a shortage of some form of drugs reviewed – that is, the number of

dosage units purportedly dispensed from a particular location – and billed to Prescription

Insurance Programs exceeded the number of dosage units ordered by Pharmacare locations from

its wholesale suppliers and delivered to that location. Mannava, in a series of interviews with

law enforcement beginning in the fall of 2013, acknowledged his participation and role in the

conspiracy to engage in health care fraud at Pharmacare.  He admits that he is jointly and

severally liable for the fraud loss based on the health care prescription claims fraudulent billed

by him and other conspirators in this fraud scheme.

<div style="margin-left:40%">

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney
D.C. Bar No. 447889

By:

JOHN P. DOMINGUEZ
Assistant United States Attorney
D.C. Bar No. 959809
Violent Crimes and Narcotics Section
555 4th Street, NW, Suite 4205
Washington, DC 20530
(202) 252-7684
E-mail: John.Dominguez@usdoj.gov

</div>

<div style="text-align:center">Defendant's Acceptance</div>

I have seen and reviewed this statement of facts and believe that it is true and accurate to the best of my knowledge.

Date: 2/24/14

Venkata Srinivas Mannava
Defendant

Attorney Attestation Clause
I have reviewed this document and these facts with my client.

Date: 2-24-2014

Jason M. Kalafat,
Attorney for the Defendant